## APPENDIX A

## PLAINTIFF'S COUNTERSTATEMENT TO DEFENDANTS' PURPORTEDLY UNDISPUTED MATERIAL FACTS AND PLAINTIFF'S SUPPLEMENTAL MATERIAL FACTS

**I.  PLAINTIFF'S COUNTERSTATEMENT TO DEFENDANTS' PURPORTEDLY UNDISPUTED MATERIAL FACTS**

1. Admitted in part, denied to the extent "a debt obligation originally owed to Capital One" implies that the debt was actually owed by Ms. Montgomery.

2. Admitted.

3. Admitted.

4. Denied. The quote "identifying" does not exist in the citied record. Plaintiff did not acknowledge any debt and requested that MCM substantiate the alleged debt.[1]

5. Admitted in part, denied in part. It is admitted that MCM sent Ms. Montgomery a dunning letter dated December 18, 2010, seeking to collect the fraudulent debt. Plaintiff does

---

[1] Defendants cite from page 36 of Angeline Ross's Deposition:

```
8    A.   I just read that as she wanted something to.. -- when it
9         says substantiate something in writing stating that
10        there was a debt, that we were the ones that -- Midland
11        Funding owned it and that Midland Credit was servicing
12        it. So some acknowledgment that we had the debt that we
13        were attempting to collect on.
14   Q.   Okay. And the only other information that you
15        have concerning this phone call was that Ms. Montgomery
16         hung up the phone when a representative from Midland
17        Credit Management asked her what her intentions were
18        regarding the debt?
```

Ex. 1 (Ross Dep. at 36:8-18).

1

not admit that the dunning letter was in accordance with 15 U.S.C. § 1692g. Plaintiff admits that the back of the dunning letter states:

> Unless you notify MCM within thirty (30) days after receiving this notice that you dispute the validity of the debt, or any portion thereof, MCM will assume this debt to be valid.
>
> If you notify MCM, in writing within thirty (30) days after receiving this notice that the debt, or any portion thereof, is disputed, MCM will obtain verification of the debt or a copy of a judgment (if there is a judgment) and MCM will mail you a copy of such verification or judgment.

6. Admitted in part, denied in part. Plaintiff admits that there is no record of MCM receiving a written dispute letter from her. Plaintiff denies that she was "instructed" to send such a letter, or that she was required by law to do so.

7. Admitted, despite the fact that the citation provided by Defendants offers no support for this factual averment. (Support provided at Ex. 1 (Ross Dep. at 40:23-41:10); Ex. 2 (MCM Account Notes at p. MIDLAND-10).

8. The citations provided by Defendants offer no support for this factual averment, therefore, Plaintiff cannot admit or deny its truth.

9. The citations provided by Defendants offer no support for this factual averment, therefore, Plaintiff cannot admit or deny its truth.

10. Admitted.

11. Denied. Burton Neil produced a total of 8 pages of documents in this matter, which have been Bates-labeled Burton Neil 1-8 in this case. Neither Burton Neil nor any party produced the February 24, 2011 letter that Defendants now attach as "Exhibit F" to their motion for summary judgment. Plaintiff has had no opportunity to examine or probe the authenticity or the veracity of the non-Bates-labeled February 24, 2011 letter now attached by Defendants. Nor

does Plaintiff admit that the dunning letter February 24, 2011, if sent to plaintiff, was in accordance with 15 U.S.C. § 1692g.

12. Admitted.

13. Admitted.

14. Admitted.

15. Admitted.

16. Admitted.

17. Admitted in part, denied to the extent that Ms. Montgomery was notified that the hearing was cancelled, as she was not. Ex. 3 (Montgomery Dep. at 131:6-134:1); Ex. 4 (Cole Dep. at 71:21-72:19 and 73:4-78:5).

## II. PLAINTIFF'S SUPPLEMENTAL MATERIAL FACTS

### A. Plaintiff Montgomery Becomes A Victim Of Credit Fraud In 2007 And Begins Disputing A Large Capital One Debt Fraudulently Incurred In Her Name In 2008

1. On October 30, 2007, Capital One Bank allowed someone to take out a loan in Plaintiff Angeline Montgomery's name, and distributed the proceeds in the form of a check for $10,000 which it mailed to an address in Darby, Pennsylvania, where Ms. Montgomery has never resided. Ex. 5 (Documents produced by Capital One Bank in response to subpoena at pp. Capital One-1-2); Ex. 3 (Montgomery Dep. at 32:20-36:8; 47:3-23; 71:6-24).

2. The Capital One loan account was opened fraudulently, Ms. Montgomery did not open the loan account, or authorize anyone else to open the loan account in her name. Ex. 3 (Montgomery Dep. at 32:20-35:11); *see also* Ex. 6 (Philadelphia Police Report at p. MONTGOMERY-8). Ms. Montgomery did not sign or deposit the Capital One check, or authorize anyone else to do so on her behalf. Ex. 3 (Montgomery Dep. at 32:20-36:8).

3. Ms. Montgomery is a victim of identity theft. Ex. 3 (Montgomery Dep. at 37:17-19) *see also* Ex. 6.

4. The Capital One check was deposited into a checking account at Commerce Bank that did not belong to the Plaintiff. Ex. 1 (at p. Capital One-1); Ex. 2 (Montgomery Dep. at 35:12-36:8).

5. From January 2008 through September 2008 Capital One sent monthly bills for this account to the Darby address. *See* Ex. 5 (Capital One-5 - Capital One-6; Capital One-9 - Capital One-10; Capital One-13 - Capital One-14; Capital One-17 - Capital One-18; Capital One-21 - Capital One-22; Capital One-25 - Capital One-26).

6. From January 2008 through September 2008 several payments were made to Capital One in partial repayment of the loan by both money order and personal check, none of which were ever from Ms. Montgomery. Ex. 5 (Capital One-4; Capital One-7 through Capital One-8; Capital One-11 through Capital One-12; Capital One-15 through Capital One-16; Capital One-19 -Capital One-20; Capital One 23 -Capital One-24 and Capital One 27 -Capital One-28).

7. When payments on the Capital One account stopped in or around September 2008 the remaining balance of the debt was approximately $6,871.53. Ex. 1 (Ross Dep. at 39:2-12) (Angelique Ross was Midland and MCM Rule 30(b)(6) witness in this matter).

8. Ms. Montgomery discovered she was the victim of fraud in July 2008, after receiving numerous collection calls from Capital One for the fraudulently incurred debt for which she has no responsibility and does not owe. Ex. 3 (Montgomery Dep. 38:4-12).

9. Ms. Montgomery reported the fraud to the Philadelphia Police Department on July 9, 2008, and a Police Report was filed. Ex. 6.

10. Ms. Montgomery also informed Capital One that she did not owe or incur the debt

and that the loan account was opened as a result of fraud. Ex. 3 (Montgomery Dep. at 39:7-17).

11. On September 5, 2008, Capital One sent Ms. Montgomery correspondence acknowledging her dispute that the Capital One account had been fraudulently opened and used. Ex. 7 (Capital One latter dated 9-5-08 at p. MONTGOMERY-5).

12. On May 13, 2009, Ms. Montgomery completed Capital One's "Identify Fraud Information Form." Ex. 8 (at p. MONTGOMERY-45-46).

13. On May 14, 2009, Ms. Montgomery sent a dispute letter to Capital One, enclosing the Identity Fraud Information Form. Ex. 9 (at p MONTGOMERY-4); see also Ex. 8.

14. Ms. Montgomery identified the suspected identity thief. Ex. 9.

15. Ms. Montgomery also provided contact information for Detective Smith at the Philadelphia Police Department if Capital One had further questions or doubted her allegations of fraud. *Id*.

**B. In 2009, The Creditor, Capital One Bank, Concludes That Ms. Montgomery Is Not Responsible For the Fraudulently Incurred Debt**

20. Based on the foregoing, on June 15, 2009, Ms. Montgomery received correspondence from Capital One stating in part "[a]n investigation has been conducted and it has been concluded that the account *does not belong to you*." Ex. 10 (Capital One latter dated 6-15-09 at p. MONTGOMERY-7) (emphasis added).

**C. Midland Purchases The Fraudulently Incurred Debt In 2010 In The Secondary Debt Market**

21. Midland routinely purchases consumer debt, not from the original creditor such as Capital One, but from a bulk debt buyer like Atlantic Credit. Ex. 1 (Ross Dep. at 28:3-13).

22. In addition to the debt, Atlantic Credit states to have provided to Midland Funding, LLC (Midland Funding) the "unadulterated electronic records of all lenders and

5

previous sellers regarding the accounts." Ex. 11; Ex. 1 (Ross Dep. at 29:6-30:4).

      **D.    Further Disputes By Ms. Montgomery In Early 2011 As MCM Unlawfully Tries To Collect The Fraudulently Incurred Debt From Her**

23. Two days after the debt was purchased by Midland Funding, the account information was entered into Midland Credit Management, Inc.'s (MCM) database for debt collections. Ex. 1 (Ross Dep. at 30:15-24).

24. MCM also states in its December 18, 2010 letter that it "is considering forwarding this account to an attorney in your state for possible litigation." *Id*.

25. Two days later, on January 19, 2011, MCM reported to the three major credit reporting agencies that Ms. Montgomery had an unpaid collection account with Midland. Ex. 1 (Ross Dep. at 41:13-42:7).

26. In fact, Ms. Montgomery paid $14.95 per month for a credit monitoring service from Citibank so she could identify new and inaccurate or fraudulent accounts appearing on her credit reports immediately. Ex. 3 (Montgomery Dep. at 142:3-143:1); and Ex. 12 (MONTGOMERY-70 through MONTGOMERY-72).

27. In response to Ms. Montgomery's January 17, 2011 dispute, MCM sent a letter to Ms. Montgomery on February 2, 2011, acknowledging her dispute and promising to conduct an "investigation." Ex. 3 (MCM latter dated 2-2-11 at p. MONTGOMERY-49); *see also* Ex. 1 (Ross Dep. at 43:16-44:1).

28. In fact, MCM did nothing to investigate Ms. Montgomery's allegations of fraud, despite its representations that it was conducting an investigation in its February 2, 2011 letter. Ex. 1 (Ross Dep. at 47:7-51:23). MCM did not review any documents from any source, speak with any witnesses, or obtain any police reports to verify that the debt was owed by Ms.

6

Montgomery, and not a result of fraud. *Id.*

  **E.**  **MCM And Midland Sue Montgomery In May 2011 For The Fraudulently Incurred Debt Using A False Robo-signed Affidavit**

  29.  The next day, on February 3, 2011, MCM sent Ms. Montgomery's alleged debt to its legal department for outsourcing to a law firm to file a debt collection lawsuit against her. Ex. 1 (Ross Dep. at 52:15-53:10); and Ex. 14 (Ross-6, p.2).

  30.  On February 20, 2011, the debt fraudulently incurred in Ms. Montgomery's name was referred to "Burton Neil & Assoc." to initiate a debt collection lawsuit against her. Ex. 15 (MIDLAND-17).

  31.  On February 26, 2011, Burton Neil through MCM's "You Got Claims" database requested that an MCM employee prepare an affidavit in support of a debt collection lawsuit to be filed against Ms. Montgomery. Ex. 1 (Ross Dep. at 56:17-57:10; and Ex. 14 (Ross-6, p.2).

  32.  Ms. Ashley Hoffman, employed as a "Legal Specialist" by MCM, signed the affidavit used to allegedly support a debt collection lawsuit against Ms. Montgomery. Ex. 16 (Hoffman Dep. at 5:22-6:3; 11:7-15); Ex. 17 (Robo-signed affidavit at p. MONTGOMERY-60). Consistent with MCM's typical practices and procedures, Ms. Hoffman did not write or type the affidavit. Ex. 1 (Ross Dep. at 58:3-10).

  33.  MCM uses a computer program "Thunderhead" to electronically generate the affidavit against the alleged debtor, which a MCM employee then signs. Ex. 16 (Hoffman Dep. at 11:7-14:4 and 40:10-16).

  34.  MCM's typical practice and procedure is to have an MCM employee sign a "stack" of affidavits. Ex. 16 (Hoffman Dep. at 14:9-15:1).

  35.  These "stacks" could include up to 200-300 affidavits per day. Ex. 16 (Hoffman

Dep. at 9:24-10:14).

36. Hoffman, on behalf of MCM, signed an affidavit for a debt collection lawsuit to be initiated against Ms. Montgomery through this same practice on March 11, 2011. Ex. 16 (Hoffman Dep. at 18:22-19:13); Ex. 17.

37. Consistent with MCM's routine for executing these affidavits, Ms. Hoffman never spoke or corresponded with Ms. Montgomery, never reviewed the application for the underlying Capital One account, never looked at any billing statements from the Capital One account, never looked into any history of disputes between Ms. Montgomery and Capital One and never reviewed any documents from Atlantic Credit prior to her execution of the affidavit. Ex.16 (Hoffman Dep. at 19:14-22:5; 24:16-25:5; 26:3-7 and 26:22-27:24).

38. Consistent with MCM's routine and practice, all Ms. Hoffman did in connection with her execution of the affidavit was "look at a computer screen of a MCM computer screen that said Ms. Montgomery owed this money." Ex. 16 (Hoffman Dep. at 28:1-12).

39. This computer screen consists of the name, address and phone number of the alleged debtor, the amount of the debt, the account number and the last payment date. Ex. 1 (Ross Dep. at 88:10-89:24).

40. MCM never requested the original application, billing statements or consumer disputes relating to the underlying Capital One account to verify or investigate its accuracy. Ex. 1 (Ross Dep. at 87:5-88:15).

41. No investigation into whether Ms. Montgomery actually owed the debt was conducted by MCM prior to the execution of the affidavit and the filing of the collection lawsuit against Ms. Montgomery, despite MCM's February 2, 2011 promise that it would investigate Plaintiff's dispute of fraud. Ex. 16 (Hoffman Dep. at 30:5-16).

42. The affidavit, Ex. 17, states as follows:

Verification

Ashley Hoffman, whose business address is 16 McLeland Rd Suite101, St. Cloud, MN 56303, certifies and says:

1. I am employed as a Legal Specialist and have access to pertinent account records for Midland Credit Management, Inc. ("MCM"), servicer of this account on behalf of plaintiff. I am a competent person over eighteen years of age, and make the statements herein based upon personal knowledge of those account records maintained on plaintiff's behalf. Plaintiff is the current owner of, and/or successor to, the obligation sued upon, and was assigned all the rights, title and interest to defendant's CAPITAL ONE account XXXXXXXX3595 (MCM Number█████████ hereinafter "the account"). I have access to and have reviewed the records pertaining to the account and am authorized to make this verification on plaintiff's behalf.

2. Based upon my review of MCM's business records: 1) defendant(s) opened the account with CAPITAL ONE on 2007-11-06; 2) the last payment posted to the account on 2008-09-26; and 3) the account was charged off on 2009-03-31.

3. The account shows that the defendant(s) owed a balance of $6879.53.

I certify under penalty of perjury that the foregoing statements are true and correct upon information and belief.

MAR 11 2011
_____
Date

Ashley Hoffman

STATE OF MINNESOTA

COUNTY OF STEARNS

Signed and sworn to (or affirmed) before me on MAR 11 2011 by Ashley Hoffman.

ASHLEY MAE LASHINSKI
Notary Public-Minnesota
My Commisssion Expires Jan.31, 2015

Notary Public

My commission expires:_____

PA1
Burton Neil & Associates, P.C.

43. On March 25, 2011, the affidavit, *supra*, was mailed to Burton Neil. Ex. 15 (MCM notes at p. MIDLAND-17).

44. On May 11, 2011, Ms. Montgomery contacted Burton Neil and spoke to a Burton Neil representative about the "debt at issue." Ex. 18 (Burton Neil Interrogatory resp. at p. 5);

9

Ex. 19 (Weinstein Dep. at 64:4-65:15, 66:4-67:8 and 67:22-68:4) (Mr. Yale Weinstein was the Burton Neil attorney who brought the collection lawsuit against Ms. Montgomery).

45. Again on May 25, 2011, Ms. Montgomery contacted Burton Neil about the debt at issue and indicated she would be appearing at the hearing on August 5, 2011 to defend herself. *Id*.

46. Prior to the filing of this lawsuit against Ms. Montgomery, the only document reviewed by Burton Neil was the check issued from Capital One to Ms. Montgomery. Ex. 19 (Weinstein Dep. at 52:22-59:6). Burton Neil did not review any other documents from Capital One, MCM or Atlantic Funding prior to filing the lawsuit against Ms. Montgomery. *Id*.

47. Burton Neil usually spends between 15 and 30 minutes investigating/reviewing paperwork before filing a debt collection lawsuit like the one here filed against Ms. Montgomery. Ex. 19 (Weinstein Dep. at 71:21-74:18)

48. On May 27, 2011, Burton Neil filed a lawsuit on behalf of Midland Funding, against Ms. Montgomery for the Capital One debt, including the affidavit. Ex. 20 (underlying lawsuit at p. MONTGOMERY-52-61).

49. The debt collection case, *Midland Funding, LLC v. Angeline Montgomery*, SC-11-05-27-6553 was filed in the Philadelphia Municipal Court, for the First Judicial District of Pennsylvania. *Id*.

50. The lawsuit included a notice to defend, directing Ms. Montgomery to appear at a hearing at 34 South 11th Street, Philadelphia, PA 19107 at 1:00 P.M. on August 5, 2011. *Id.* at p. MONTGOMERY-55.

51. On July 28, 2011, unbeknownst to Ms. Montgomery, MCM requested that Burton Neil stop the debt collection lawsuit against Ms. Montgomery. Ex. 1 (Ross Dep. at 62:2-24). Specifically, Midland's notes reflect "[r]ecalled by seller due to Fraud." Ex. 15.

52. Also unbeknownst to Ms. Montgomery, MCM through Burton Neil asked the court on August 2, 2011 to withdraw the debt collection litigation without prejudice. Ex. 19 (Weinstein Dep. 69:17-70:14). No one from MCM or Burton Neil pursuant to the Pennsylvania Rules of Civil Procedure, or even as a courtesy, contacted Ms. Montgomery to inform her that the debt collection lawsuit had been withdrawn and she need not appear in court on August 5, 2011. *Id*.

53. On August 5, 2011, Ms. Montgomery and her husband, Walter Cole, appeared for the hearing at the designated place and time. Ex. 3 (Montgomery Dep. at 131:6-134:1); Ex. 4 (Cole Dep. at 71:21-72:19 and 73:4-78:5).

54. Ms. Montgomery and her husband testified that the appearance at the debt collection hearing cost them money out of pocket in the form of lost wages and travel costs from their home in Northeast Philadelphia to Center City. Ex. 3 (Montgomery Dep. 81:16-82:12; 130:18-131:13; 134:8-134:15); and Ex. 4 (Cole Dep. at 74:1-23 and 87:20-89:3)

55. After several hours of waiting, Ms. Montgomery was told by a court employee that she was free to go home and that there would be no hearing on the matter since the debt collection lawsuit had been withdrawn. *Id*.

56. In September 2011 MCM received a refund for the debt from Atlantic Credit. Ex. 1 (Ross Dep. at 63:16-64:1).

57. On September 15, 2011, MCM sent Ms. Montgomery correspondence stating that the account in question was "transferred in error," and had been "recalled by Capital One." Ex. 21 (MONTGOMERY-48); Ex. 1 (Ross Dep. at 66:1-24).

58. In its September 15, 2011 correspondence MCM represented that it would delete the collection account from reporting on Ms. Montgomery's credit reports because of "substantiation of fraud." Ex. 21; Ex. 1 (Ross Dep. at 68:2-11).

59. MCM's corporate representative admits that once an account is closed, such as Ms. Montgomery's, MCM doesn't "re-enable those accounts or do any further collection after that happens." Ex. 1 (Ross Dep. at 69:2-11).

60. Further, MCM stated that it would not sue Ms. Montgomery again for the debt in question after September 2011. Ex. 1 (Ross Dep. at 76:8-77:8). Midland and MCM's attorney Yale Weinstein reached the same conclusion at his deposition. Ex. 19 (Weinstein Dep. at 96:16-24).

**F. The MCM and Midland Robo-Signing Process Of Preparing Collection Affidavits Has Not Changed Since 2009 Despite A Judicial Finding That It is Unlawful Under The FDCPA**

61. In *Midland Funding, LLC v. Brent*, the Northern District of Ohio granted summary judgment in favor of the consumer-plaintiff, ruling that Midland Funding and MCM "violated the Fair Debt Collection Practices Act (FDCPA) by attempting to collect a debt with a false affidavit." 644 F. Supp. 2d 961, 963 (N.D. Ohio Aug. 11, 2009). The court rested upon the following facts in making such a determination:

    a. Midland "purchas[ed] the Brent debt along with a package of other unpaid credit card balances." *Midland*, 644 F. Supp. 2d at 966.

b. The debt collection attorney "requested an affidavit" to support the debt collection lawsuit using the "'You've Got Claims' computer system." *Midland*, 644 F. Supp. 2d at 966.

c. A legal specialist would find affidavits on a "stack on a printer" and "personally sign[s] between 200 and 400 of such affidavits per day." *Midland*, 644 F. Supp. 2d at 966-67.

d. "In paragraph 1, the affidavit reads ". . . I make these statements herein based upon my personal knowledge" despite the specialist never having any contact with plaintiff-consumer. 644 F. Supp. 2d at 967.[2]

62. Midland has not changed its practices since 2009, thus the affidavit deemed misleading and unlawful by the court in *Midland Funding, LLC v. Brent*, used here is similarly unlawful.

a. Midland purchased Ms. Montgomery's debt from Atlantic Credit in a bulk debt purchase. Ex. 1 (Ross Dep. at 27:25-28:13; 29:11-20); Ex. 11.

b. Burton Neil, on behalf of Midland, obtained an affidavit through the "You Got Claims" database, which electronically generated the affidavit used to support the litigation against Ms. Montgomery. Ex. 1 (Ross Dep. at 56:17-57:10); and Ex. 14 (Ross-6, p.2).

c. Ms. Hoffman, a legal specialist, testified that she would sign a stack of up to 200-300 affidavits a day. Ex. 16 (Hoffman Dep. at 9:24-10:14 and 14:9-15:1).

---

[2] Upon request a court may take judicial notice of fact, such as a case filing or order of court, if the fact is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid., *Smith v. Litton Loan Servicing, LP*, 2005 WL 289927, at *5 (E.D. of Pa. Feb. 4, 2005) *citing Com. of Pa. v. Brown*, 373 F.2d 771, 778 (3d Cir. 1976).

d. Ms. Hoffman states in her affidavit that she "and make[s] these statements herein based upon personal knowledge of those account records maintained on plaintiff's behalf," despite not reviewing any account records maintained by Capital One, Midland or Atlantic Financial. Ex. 16 (Hoffman Dep. at 19:14-22:5; 24:16-25:5; 26:3-7 and 26:22-27:24); *see also* Ex. 1 (Ross Dep. at 91:12-20; 92:8-15).

63. Defendants' affidavit has not changed since at least 2009, despite their knowledge that the affidavit had been found to be misleading by a federal court. Ex. 19 (Weinstein Dep. at 49:13-50:14); Ex. 16 (Hoffman Dep. at 42:10- 45:11 and 52:14-24).

64. In fact, MCM's employee Hoffman has been sued three times personally for signing allegedly false affidavits, yet no changes have been made to the affidavit's language. Ex. 16 (Hoffman Dep. at 45:21-48:15).

65. In addition to the *Brent* class action, Midland and MCM have been sued dozens of times (and have always settled) for bringing collection lawsuits against consumers based upon robo-signed affidavits. *See James v. Encore Capital Group, et al.,* Case No. 3:11-cv-221 (E.D. Va.) (see Complaint for detailed discussion of Midland's robo-signing problem); *see also Walker v. Encore Capital Group, Inc., et al.,* Case No. 2:12-cv-00212 (E.D. Tenn.); *Jolley v. Encore Capital Group, Inc., et al.,* Case No. 2:12-cv-00234 (E.D. Tenn.)*; Hawthorne v. Encore Capital Group, Inc., et al.,* Case No. 3:12-cv-00242 (E.D. Tenn.); *Waddell v. Encore Capital Group, Inc., et al.,* Case No. 2:12-cv-00243 (E.D. Tenn.); *Dehart v. Encore Capital Group, Inc., et al.,* Case No. 12-cv-265 (E.D. Tenn.); *Irby v. Encore Capital Group, Inc., et al.*, Case No. 3:12-cv-00241 (E.D. Tenn.); *Honeycutt v. Encore Capital Group, Inc., et al.*, Case No. 3:12-cv-00239 (E.D. Tenn.); *Pena v. Midland Funding LLC, et al.,* Case No. 3:10-cv-294 (E.D. Tenn.); *McBryar v. Midland Funding LLC, et al.,* Case No. 3:10-cv-295 (E.D. Tenn.); *Williams v.*

*Midland Funding LLC, et al.,* Case No. 3:10-cv-355 (E.D. Tenn.); *Causby v. Encore Capital Group, Inc., et al.,* Case No. 3:12-cv-00168 (E.D. Tenn.); *Bryan v. Encore Capital Group, Inc., et al.,* Case No. 3:12-cv-00189 (E.D. Tenn.); *McGuff v. Encore Capital Group, Inc., et al.*, Case No. 3:12-cv-00260 (E.D. Tenn.); *Norris v. Encore Capital Group, Inc., et al.,* Case No. 2:12-cv-00173 (E.D. Tenn.); *Mendenhall v. Encore Capital Group, Inc., et al.*, Case No. 2:12-cv-00237 (E.D. Tenn.); *Gardner v. Encore Capital Group, Inc., et al.,* Case No. 2:12-cv-00136 (E.D. Tenn.); *Anderson v. Encore Capital Group, Inc., et al.*, Case No. 2:12-cv-00147 (E.D. Tenn.); *Price v. Encore Capital Group, Inc., et al.*, Case No. 2:12-cv-00257 (E.D. Tenn.); *Williams v. Encore Capital Group, Inc., et al.,* Case No. 12-cv-00188 (E.D. Tenn.); *Hampton v. Encore Capital Group, Inc., et al.,* Case No. 2:12-cv-00115 (E.D. Tenn.); *Thompson v. Encore Capital Group, Inc., et al.,* Case No. 2:12-cv-00114 (E.D. Tenn.); *Leonard v. Encore Capital Group, Inc., et al.,* Case No. 2:12-cv-00121 (E.D. Tenn.); *Walters v. Encore Capital Group, Inc., et al.,* Case No. 2:12-cv-00166 (E.D. Tenn.); *White v. Encore Capital Group, Inc., et al.,* Case No. 2:12-cv-00134 (E.D. Tenn.); *Walker v. Encore Capital Group, Inc., et al.,* Case No. 2:12-cv-00133 (E.D. Tenn.); *Hinkle v. Encore Capital Group, Inc., et al.,* Case No. 2:12-cv-00141 (E.D. Tenn.).

66. Plaintiff has produced an expert report by Daniel S. Bernheim 3d, an experienced attorney who has counseled the debt collection industry for years and who has taught and published in the area of fair debt collection. Ex. 22 (Bernheim expert report and CV). Mr. Bernheim opines that Defendants failed to follow proper collection industry standards in their attempts to collect the debt from Ms. Montgomery and completely failed to conduct any type of a proper pre-suit investigation under the facts of this case before brining a collection lawsuit against Mr. Montgomery on Pennsylvania sate court.