# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANGELINE MONTGOMERY,

       Plaintiff,

   vs.

MIDLAND CREDIT MANAGEMENT CO., et al.,

       Defendants.

ORIGINAL

)
)
)
)
) Case No.:
) 12-1244
)
)
)
)
)

DEPOSITION OF ANGELIQUE ROSS,

taken by the Plaintiff, commencing at the hour of

9:00 a.m. on Friday, March 1, 2013, at 530 "B" Street,

Suite 350, San Diego, California, before Julie A. McKay,

Certified Shorthand Reporter in and for the State of

California.

SUMMIT COURT REPORTING, INC.
Certified Court Reporters & Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey  08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

ANGELIQUE ROSS

```
 1              VIDEO TECHNICIAN:  Will the court reporter
 2     please swear in the witness.
 3
 4                        ANGELIQUE ROSS,
 5        having been first duly sworn, testified as follows:
 6
 7                        EXAMINATION
 8     BY MR. SOUMILAS:
 9         Q.    Good morning.
10         A.    Good morning.
11         Q.    Would you please state your full name for the
12     record.
13         A.    Angelique Danielle Ross.
14         Q.    May I call you Mrs. Ross?
15         A.    Yes.
16         Q.    Who is your employer, Mrs. Ross?
17         A.    Midland Credit Management.
18         Q.    Do I understand that you are the Consumer
19     Support Services Manager at Midland Credit Management?
20         A.    Yes.  One of them, yes.
21         Q.    How long have you held that manager title?
22         A.    Almost seven years.
23         Q.    Is it true that you've worked for Midland
24     Credit Management for almost ten years now?
25         A.    Yes.
```

**ANGELIQUE ROSS**

1       Q.    Where is your office located?

2       A.    8875 Aero Drive in San Diego.

3       Q.    Is that where Midland Credit Management's

4    headquarters is also located?

5       A.    We have a -- another office also located in

6    San Diego.

7       Q.    So are you in the main office in San Diego or

8    the second office?

9       A.    I'm not in the corporate office.  I'm in the

10   second office.

11      Q.    And I understand the Midland Credit Management

12   also has facilities in St. Cloud, Minnesota; is that

13   correct?

14      A.    That's correct.

15      Q.    Anyplace else?

16      A.    Yes.

17      Q.    Where else?

18      A.    Phoenix, Arizona; Gurgaon, India; and in Costa

19   Rica.

20      Q.    Now, today you are giving testimony under oath

21   as a corporate representative of your employer Midland

22   Credit Management.

23            Do you understand that?

24      A.    Yes.

25      Q.    And you have also been designated as the

**ANGELIQUE ROSS**

1    corporate representative for a second Midland defendant

2    in this particular lawsuit, Midland Funding LLC.

3            Do you understand that you are speaking for

4    Midland Funding LLC also today?

5        A.    Yes.

6        Q.    And I understand that you have given testimony

7    under oath before in your life for both Midland Credit

8    Management and Midland Funding, correct?

9        A.    Correct.

10       Q.    Several occasions?

11       A.    Correct.

12       Q.    The particular notices that bring us here have

13   been premarked and placed in front of you as Ross 1 and

14   Ross 2.

15            (Plaintiff's Exhibit No. 1 marked for

16            identification.)

17            (Plaintiff's Exhibit No. 2 marked for

18            identification.)

19   BY MR. SOUMILAS:

20       Q.    Do you have a copy of those, ma'am?

21       A.    I do.

22       Q.    And you will notice that Ross 1 requests a

23   representative to speak on a number of topics on behalf

24   of Midland Credit Management, Inc.

25            Do you see that?

ANGELIQUE ROSS

1           Do you see that?

2      A.   Yes.

3      Q.   You would agree with me that this collection

4  detail looks very similar to the collection detail

5  within Ross 5 that we see at Midland pages 9, 10 and 11?

6      A.   Yes.

7      Q.   Okay.  And you will notice that both of these

8  collection detail notes from Ms. Montgomery's account

9  have certain data blocked out.

10           Do you see that?

11      A.   Yes.

12      Q.   I don't know why it's blocked out.  But we have

13  both of these copies, so we might need to use them in

14  aid of your testimony so that we can explain to us the

15  chronology of this account.  Okay?

16      A.   Okay.

17      Q.   So that's what I am going to do next.  I'm

18  going to try to go with you through the history of this

19  account.  And if you need to reference any of the

20  documents in Ross 5 or Ross 6 or any other document in

21  order to answer any of my questions, would you let me

22  know?

23      A.   I will.

24      Q.   Okay.  So let's begin at the beginning.

25           Am I correct that Midland Funding purchased

**ANGELIQUE ROSS**

1  this account on December 9th, 2010?

2      A.   Yes.

3      Q.   Midland Funding did not purchase the account

4  from Capital One, but purchased it from a different

5  company called Atlantic Credit & Finance Special Finance

6  Unit III, LLC; is that correct?

7      A.   (Witness reviews document.)

8      Q.   And if it helps you, please look at Midland 7,

9  which appears to be the bill of sale.

10     A.   Yes.

11     Q.   This is a typical transaction where Midland

12  Funding buys debt from a secondary buyer, if you will?

13     A.   In this case, yes, it was a secondary buyer.

14     Q.   Right.

15          Sometimes Midland Funding purchases debt

16  directly from a credit card company and sometimes from a

17  secondary buyer.

18          Is that accurate?

19     A.   Yes.

20     Q.   The particular bill of sale that we have here

21  within Ross 5 of page Midland 7 says that the seller --

22  which is Atlantic Credit & Finance.

23          Am I correct about that?

24     A.   Yes.

25     Q.   -- says that it is providing business records

ANGELIQUE ROSS

1    regarding the accounts.

2              Do you see that in paragraph 2, which begins,

3    "Seller represents and warrants..."?

4         A.   I'm sorry.  You said -- can you repeat what you

5    asked me?

6         Q.   Yes.

7              Paragraph 2 begins, "Seller represents and

8    warrants..."

9              Do you see that?

10        A.   Yes.

11        Q.   And there is -- does the seller represent and

12   warrant that it is providing the seller's own business

13   records regarding the accounts?

14        A.   Yes.

15        Q.   Okay.  So I take it there are many accounts

16   being purchased all at the same time from Atlantic

17   Credit & Finance, correct?

18        A.   Yes.

19        Q.   And Ms. Montgomery's was one of them?

20        A.   Yes.

21        Q.   All right.  And the bill of sale further says

22   it has -- "The Seller has in this sale provided the

23   unadulterated electronic records of all original lenders

24   and previous sellers regarding the accounts."

25              Do you see that?

**ANGELIQUE ROSS**

1        A.    Yes.

2        Q.    Would the original lender in the case of

3   Ms. Montgomery be Capital One?

4        A.    Yes.

5        Q.    And subsequent sellers would be someone else

6   who may have owned this debt before Midland such as

7   Atlantic Credit & Finance, correct?

8        A.    Yes.

9        Q.    And according to this bill of sale, Atlantic

10  Credit & Finance is conveying to Midland Funding not

11  only its own records, but also the unadulterated

12  electronic records of all original lenders and previous

13  sellers, correct?

14       A.    Correct.

15       Q.    All right.  So almost immediately within two

16  days, the account gets loaded onto Midland's system for

17  collection.  So if you look at Midland 11, for example,

18  there is an entry two days later, December 11th, 2010.

19            Do you see that?

20       A.    Yes.

21       Q.    That appears to be the first entry in the

22  collection detail for this particular Capital One

23  account for Ms. Montgomery, correct?

24       A.    Correct.

25       Q.    All right.  And then we turn to -- am I correct

**ANGELIQUE ROSS**

1   that Midland Credit Management would attempt to call

2   Ms. Montgomery?

3        A.   Is your question that we did call

4   Ms. Montgomery or --

5        Q.   No.  Would the regular course -- strike that.

6             You told me that Midland Credit Management

7   services these debts by calling and sending letters and

8   on occasion referring them to law firms for legal

9   action, correct?

10       A.   Yes.  So we -- we do call on accounts.  We do

11  letter accounts.  And we do refer to law firms.

12       Q.   Okay.  Am I correct that Midland Credit

13  Management, according to its own records, attempted to

14  call Ms. Montgomery concerning this debt on

15  December 18th, 2010, about a week after it loaded it

16  onto its system for collections?

17       A.   Yes.

18       Q.   And the call, according to your verified

19  interrogatory response, was about 6:39 in the morning,

20  correct?

21       A.   Yes.  That's what the records say.

22       Q.   All right.  Now, the records also say that

23  Ms. Montgomery answered the call and advised Midland

24  Credit Management that it needed to substantiate this

25  debt; isn't that correct?

**ANGELIQUE ROSS**

1          That's what it says, right?

2     A.   Correct.

3     Q.   She didn't call you.  You called her.  Isn't

4  that correct?

5     A.   Yes.

6     Q.   She had no reason to call you since she didn't

7  even know that Midland Credit Management had purchased

8  the debt a week earlier, correct?

9     A.   I mean -- no, I don't think she knew that.

10     Q.   So she had no reason to just call you.  She --

11  she would not have received a letter that was prepared

12  that same day, correct?

13     A.   Correct.

14     Q.   All right.  So the phone call happened first,

15  correct?

16     A.   Correct.

17     Q.   And according to your verified response, the

18  plaintiff -- that would be Ms. Montgomery -- asked for,

19  quote, something, end quote, to substantiate the debt,

20  correct?

21     A.   Yes.

22     Q.   Ms. Montgomery did not say she owed the debt

23  and that you could just charge her for it, correct?

24     A.   No, she didn't say that she owed the debt.

25     Q.   Okay.  So your characterization of that

**ANGELIQUE ROSS**

1    transaction was that she was asking for some proof or

2    substantiation concerning this debt, correct?

3           MR. SCHWARTZ:  Objection.  Objection as to

4    form.  I think you are taking it out of context.

5    BY MR. SOUMILAS:

6       Q.   You can answer, ma'am.

7       A.   I -- I don't read that as she asked for proof.

8    I just read that as she wanted something to -- when it

9    says substantiate something in writing stating that

10   there was a debt, that we were the ones that -- Midland

11   Funding owned it and that Midland Credit was servicing

12   it.  So some acknowledgment that we had the debt that we

13   were attempting to collect on.

14      Q.   Okay.  And the only other information that you

15   have concerning this phone call was that Ms. Montgomery

16   hung up the phone when a representative from Midland

17   Credit Management asked her what her intentions were

18   regarding the debt?

19      A.   Yes.

20      Q.   You don't take this first call as an

21   acknowledgment by Ms. Montgomery that she owed the debt,

22   correct?

23      A.   No.

24      Q.   Do you take it as a dispute?  That she's

25   telling Midland Management that "I don't agree that I

**ANGELIQUE ROSS**

1      A.   I'm not sure what you mean.

2      Q.   Look at Midland 6, please.

3           Would you agree with me that, according to your

4    own record, the balance on the Capital One debt was

5    $6,871.53?

6      A.   It's listed as the previous balance.

7      Q.   Okay.  Is that the Capital One balance?

8      A.   Let me see.

9           I believe so.  I'm not positive.

10     Q.   Did Midland Credit Management add about $700 in

11   interest at six percent on this debt?

12     A.   Yes.

13     Q.   You would agree with me that Midland Credit

14   Management has no legal right to add interest on this

15   debt?

16          MR. SCHWARTZ:  Objection as to form.

17          You can answer, if you can.

18          THE WITNESS:  No, I wouldn't agree with that.

19   BY MR. SOUMILAS:

20     Q.   You're trained in the Fair Debt Collection

21   Practices Act, correct?

22     A.   Yes.

23     Q.   That is the federal statute that regulates your

24   entire business, correct?

25     A.   Correct.

ANGELIQUE ROSS

1    Q.   Are you of the view that Midland could add

2    interest on debts absent a statutory right to do it or

3    an expressed contract to do it?

4    A.   I -- I don't know if I can answer that

5    question.

6    Q.   Okay.  Are you aware of any statutory right

7    that would allow Midland to add interest on this debt?

8    A.   I don't know.

9    Q.   Are you aware of any contract that explicitly

10   allows for six percent interest to be added on this

11   debt?

12   A.   I don't know that, either.

13   Q.   Okay.  You would agree with me that when

14   Ms. Montgomery was later sued for an amount owed to --

15   on the Capital One debt, they didn't add the interest,

16   right?  They went back to the 6879 figure?

17   A.   I believe so, yes.

18   Q.   But on the initial letter when she was asked to

19   pay, you tacked on another $700 in interest, according

20   to the letter dated December 18th, 2010, correct?

21   A.   Yes.

22   Q.   Okay.  Now, let's go back to your notes.

23        Am I correct that about a month later,

24   January 17th, 2011, Ms. Montgomery had another telephone

25   call with Midland Credit Management?

**ANGELIQUE ROSS**

1      A.    Yes.

2      Q.    This time she called you?

3      A.    Yes.

4      Q.    And according to your notes, you received that

5   telephone call, correct?

6      A.    Correct.

7      Q.    And according to your notes, the consumer --

8   that would be Ms. Montgomery -- claimed she was a victim

9   of fraud, slash, identity theft, correct?

10     A.    Yes.

11     Q.    All right.  Now, that was January 17th, 2011?

12     A.    Yes.

13     Q.    Two days later, Midland sent this account to be

14   reported on Ms. Montgomery's credit reports, correct?

15     A.    Yes.

16     Q.    And this was reported as a derogatory account,

17   correct?

18     A.    As a collection account, yes.

19     Q.    That is a derogatory account.  It's not a

20   positive account or a neutral account.  It's a negative

21   account.

22           You would agree with me?

23     A.    I -- I agree.  It's not positive.

24     Q.    It's negative.  Would you agree with that?

25     A.    Yeah.

**ANGELIQUE ROSS**

1    Q.    Okay.  So it's a collection account to be

2    placed on all three of her credit reports with the

3    national credit reporting agencies, correct?

4        A.    Yes.

5        Q.    And reported by Midland Credit Management,

6    correct?

7        A.    Correct.

8        Q.    Okay.  Now, continuing on the notes that

9    Midland has concerning this account, am I correct as a

10   result of that call, Midland sent a letter to

11   Ms. Montgomery?

12       A.    No.  Do you mean based on that call?

13       Q.    Based on that call, did -- did Midland send a

14   letter to Ms. Montgomery -- yeah, that was my question.

15       A.    Indirectly.  The -- there was a delay in

16   sending that letter as per our process because we were

17   waiting to receive the letter of dispute from

18   Ms. Montgomery.

19           So it wasn't -- it wasn't that that

20   conversation happened and the -- the letter was

21   immediately triggered.

22       Q.    Okay.  Give me a moment, please.

23           (Pause in proceedings.)

24           Ms. Ross, I'm now going to put in front of you

25   certain records that Ms. Montgomery produced to the

**ANGELIQUE ROSS**

1    Midland defendants in this case.  I've marked them

2    collectively as Ross 8 for purposes of our handling here

3    today.

4              (Plaintiff's Exhibit No. 8 marked for

5              identification.)

6    BY MR. SOUMILAS:

7       Q.    And I'll represent to you that these are not

8    all the -- the records that we produced, but there are

9    some that we might reference here today.

10             And, in particular, I would like to direct your

11   attention to a letter that is within this stack of

12   documents and has "Montgomery 49" at the bottom of it.

13             Would you please take a look at that letter.

14             Do you have it?

15      A.    Yes.

16      Q.    Okay.  And now we are at February 2nd, 2011,

17   according to this letter.  "Yes"?

18      A.    Yes.

19      Q.    And it is a letter by Midland Credit Management

20   to Ms. Montgomery, correct?

21      A.    Correct.

22      Q.    And the purpose of this letter in early

23   February is to acknowledge her dispute and to try to

24   gather information for your investigation, correct, into

25   that dispute?

**ANGELIQUE ROSS**

1      A.    Yes.

2      Q.    All right.  So I'm trying to figure out whether

3    the thing that prompted -- that prompted this letter

4    going out is a telephone call that happened the previous

5    month around January 17th.

6      A.    So it's -- the answer is kind of yes and no.

7    The --

8      Q.    Please explain.

9      A.    When the consumer called in and claimed

10   identity theft, her verbal dispute was within the

11   validation period.  So as part of our process, we do ask

12   consumers to send in something in writing stating what

13   their dispute is, which is captured in the notes there.

14   Just a letter of dispute.  We did not ask for proof at

15   that time.

16         And then the account is coded so that it can be

17   sequestered and sit in a non-collection activity type

18   holding space in our system.  That is to allow the

19   consumer time to send in their letter of dispute.  While

20   the FDCPA says 30 days, we actually give 45 just to

21   allow for any mail delays.

22         And so that account stayed in that area of our

23   system for the remainder of that -- the 45 days from the

24   date of the first letter.  And then once we didn't

25   receive anything during that period of time, we then

**ANGELIQUE ROSS**

1   send out a letter, which is the letter you referenced,

2   then saying, you know, we need more information.

3       Q.   All right.  Let me make sure I understand the

4   chronology correctly.

5           It is the telephone call around January 17th

6   that prompts Midland Credit Management to put the

7   account in this hold status because it's under dispute,

8   correct?

9       A.   Correct.

10      Q.   All right.  Now, according to your notes, if

11  you look back at Ross 5, please.

12      A.   Uh-huh.

13      Q.   And those are the account notes?

14      A.   Yes.

15      Q.   Midland 10, do you have those?

16      A.   Yes.

17      Q.   Do you see the entry on the far right-hand

18  side?  It says, "February 1, 2011."

19      A.   Yes.

20      Q.   Do you see the note on the left-hand side says,

21  "Okay for work dispute outside validation period.

22  Consumer needs to send proof"?

23      A.   Correct.

24      Q.   Okay.  So the note on February 1st was that

25  it's okay to work this account, correct?

**ANGELIQUE ROSS**

1      A.    Yes, because the consumer had not sent in the

2    written letter of dispute inside the validation period

3    as was requested.

4      Q.    In fact, the letter that Midland Credit

5    Management sent to Ms. Montgomery asking for this proof

6    didn't go out until the next day, February 2nd,

7    according to Montgomery 49; isn't that correct?

8      A.    Yeah, that's correct.

9      Q.    Okay.  So in that letter, you say, "The purpose

10    of this letter is to request your assistance so that we

11    may reach a quick resolution to your dispute."

12          Do you see that?

13      A.    Yes.

14      Q.    Okay.  The day before, the account had already

15    been okayed to work, correct?

16      A.    Correct.

17      Q.    And then the second paragraph begins, "As part

18    of our investigation of your dispute, it would be

19    helpful to have a copy of any documentation that you may

20    have that supports your dispute."

21          Do you see that?

22      A.    I do.

23      Q.    Okay.  That's part of Midland Credit

24    Management's investigation, according to this letter,

25    correct?

**ANGELIQUE ROSS**

1        A.    It -- it is part of it after the validation

2   period.

3        Q.    Right.

4              There was no investigation done whatsoever;

5   isn't that correct?

6        A.    Are you talking about when --

7        Q.    In the February 2011 time frame, Midland

8   conducted no investigation.  There is no record of any

9   investigation into Ms. Montgomery's dispute; isn't that

10  correct?

11       A.    Not a specific investigation.  We would always

12  wait to get the -- receive the letter of dispute before

13  initiating the investigation.

14       Q.    But Midland did not go out on its own and try

15  to get any supporting documentation concerning

16  Ms. Montgomery's dispute, correct?

17       A.    No, because that's triggered by the written

18  request from the consumer during that validation period.

19       Q.    Okay.  So I want to understand what they are

20  telling Ms. Montgomery will be part of your

21  investigation into this matter in February of 2011.

22             Did Midland interview a single person

23  concerning Ms. Montgomery's dispute?

24       A.    In February?

25       Q.    Yes.

ANGELIQUE ROSS

1    A.   Not to my knowledge.

2    Q.   Did Midland obtain any records from Capital One

3 that might show that Ms. Montgomery had disputed the

4 account as a fraud years earlier with Capital One?

5    A.   I don't know that we requested those in

6 February.  As I mentioned, the investigation would have

7 been triggered by her written letter of dispute, which

8 didn't occur.

9    Q.   You would agree with me that the letter dated

10 February 2nd, 2011 says, "As part of our investigation

11 into your dispute..."

12        That's how the second paragraph begins,

13 correct?

14    A.   Yes.

15    Q.   Okay.  Let's just focus on whether there was

16 any investigation into her dispute in the February 2011

17 time frame.

18        You've agreed so far that Midland Credit

19 Management interviewed no witnesses, correct?

20    A.   Correct.

21    Q.   And you would agree with me that it gathered no

22 documents on its own.

23        Do you agree with that?

24    A.   Not to my knowledge.  We didn't in February.

25    Q.   There is no record that Midland went back to

**ANGELIQUE ROSS**

1    Capital One and got the original application for this

2    credit account, correct?

3        A.    No, because we hadn't received the written

4    letter of request from Ms. Montgomery.

5        Q.    But you had received her dispute that she

6    claimed to be a victim of fraud and identity theft two

7    weeks earlier, correct?

8        A.    Yes.   We -- as part of that verbal dispute, we

9    requested that she send something in writing.   And when

10   that didn't happen, then the -- we trigger the account

11   movement and then this letter to request now at that

12   point that the consumer provide proof of their dispute.

13       Q.    No.   I must disrespectfully disagree with you.

14   That's not what your letter says.

15           MR. SCHWARTZ:   Objection.   Objection.   Are you

16   going to ask a question?

17           MR. SOUMILAS:   Yeah, I will ask a question.

18   BY MR. SOUMILAS:

19       Q.    Would you agree with me that the letter says

20   that "It would be helpful to have a copy of any

21   documentation that you may have that supports your

22   dispute"?

23           That's what your letter says, correct?

24       A.    Yes.

25       Q.    And it also says that as part of Midland's

**ANGELIQUE ROSS**

1    investigation, such documentation from Ms. Montgomery

2    would be helpful, correct?

3        A.    Correct.

4        Q.    All right.  So I'm focusing not on what

5    Ms. Montgomery may have sent that Midland would consider

6    to be helpful.  I'm focusing on what Midland may have

7    done as part of its own investigation.

8            Are you with me?

9        A.    Yes.

10        Q.    So am I correct that Midland did not obtain any

11    police report from Capital One concerning

12    Ms. Montgomery's dispute of fraud?

13            MR. SCHWARTZ:  Objection as to form.  Objection

14    as to form.

15            MR. SOUMILAS:  Fine.

16    BY MR. SOUMILAS:

17        Q.    In February of 2011, am I correct that Midland

18    Credit Management did not obtain any police report from

19    Capital One concerning Ms. Montgomery's dispute of

20    fraud?

21            MR. SCHWARTZ:  Verbal dispute?

22            MR. SOUMILAS:  Verbal dispute, yes.

23            MR. SCHWARTZ:  Thank you.

24            THE WITNESS:  No, we did not.

25

**ANGELIQUE ROSS**

1    BY MR. SOUMILAS:

2        Q.    Am I correct that in response to

3    Ms. Montgomery's verbal dispute of fraud, Midland Credit

4    Management did not obtain any fraud affidavit that

5    Ms. Montgomery had filled out with Capital One?

6        A.    No.   We requested that she send something in

7    writing, and that didn't happen, so we did not talk to

8    Capital One in February.

9        Q.    And you -- you, Midland Credit Management,

10   conducted no investigation whatsoever in February 2011

11   into Ms. Montgomery's verbal dispute of fraud; isn't

12   that correct?

13       A.    Not a typical investigation.   The process is to

14   document what's being said to mark the account so it can

15   be recorded as disputed and to request a letter of

16   dispute.

17       Q.    You did not conduct an investigation that

18   involved speaking with any witnesses or gathering any

19   documents.

20             Is that accurate?

21       A.    Yes.

22       Q.    Yes, that's accurate?   Correct?

23       A.    Correct.

24       Q.    All right.   Now, the very next day after your

25   February 2nd, 2011 letter, Midland decided to send this

ANGELIQUE ROSS

1     account to a law firm so that Ms. Montgomery could get

2     sued; isn't that right?

3             MR. SCHWARTZ:  Objection as to form.

4             You can answer, if you can.

5             MR. SOUMILAS:  I will rephrase it.

6     BY MR. SOUMILAS:

7        Q.   The very next day after your February 2nd, 2011

8     letter, Midland Credit Management referred this account

9     to a law firm to consider suing Ms. Montgomery for the

10    Capital One debt?

11       A.   No.  It looks like it was referred on 2/20.

12       Q.   What does "Sent to legal" mean?

13       A.   It's a program.  That's what the "CC0130R"

14    means.

15       Q.   Would you please take a look at the document

16    we've marked as Ross 5.  I'm sorry.  It would be Ross 6

17    for purposes of today.

18       A.   Yes.

19       Q.   Do you see the collection detail notes for this

20    account on the second page?  They are in

21    chronological -- reverse chronological order.

22       A.   Yes.

23       Q.   Do you see an entry on February 3rd, 2011?

24       A.   Yes.

25       Q.   And on that entry, it says, "Sent to MCM

**ANGELIQUE ROSS**

1   legal."

2           What does that mean?

3       A.   To my knowledge, it's a program in our system

4   that will review accounts.

5       Q.   It's a program in Midland's computer system?

6       A.   Yes.

7       Q.   That will review accounts of debts for what

8   purpose?

9       A.   I believe it's to review to see if accounts are

10  eligible to be sent to a firm.

11      Q.   Does this computer system know how to do -- to

12  trigger that review on its own or does somebody actually

13  do it?

14      A.   I know a person manages it.  I don't know

15  exactly how the program works.

16      Q.   According to the entry that we have here, does

17  it look like it's a computer-generated entry to send

18  this account to legal?

19      A.   Yes.

20      Q.   So would you agree with me that it looks like

21  Midland's computer decided the day after it sent a

22  letter asking for some helpful information from

23  Ms. Montgomery to refer this matter to legal for a

24  possible lawsuit?

25      A.   It looks like the system generated that review

**ANGELIQUE ROSS**

1     A.    I'm not aware of any specific person that made

2    it -- that decision.

3     Q.    Okay.  You've not identified anybody, correct?

4     A.    No.

5     Q.    And you are familiar with the entries that we

6    see here in the account detail screens, correct?

7     A.    Correct.

8     Q.    And as far as you could tell, they appear to be

9    computer-generated entries.  The system themselves put

10   them in, correct?

11    A.    Yes.

12    Q.    Because this particular account was one that

13   met the profile as one eligible for a possible lawsuit,

14   correct?

15    A.    Yes.  It would have had to in order to be

16   referred.

17    Q.    Right.

18          And you are aware that there was a lawsuit that

19   Burton Neil & Associates, in fact, brought against

20   Ms. Montgomery, correct?

21    A.    Yes.

22    Q.    You are aware that a Midland Credit Management

23   employee signed an affidavit in support of that lawsuit,

24   correct?

25    A.    Yes.

**ANGELIQUE ROSS**

1        Q.    The notes show that the affidavit would have

2    been requested on February 26, 2011.  Am I correct about

3    that?

4        A.    Yes.

5        Q.    Was it requested by the You Got Claims computer

6    system?

7        A.    The You Got Claims system would have

8    transmitted the request, but to my knowledge, the system

9    itself is not requesting anything.  That request has to

10   be triggered by a person.

11       Q.    Okay.  Who triggered the request on February 26

12   for an affidavit to be provided?

13            MR. SCHWARTZ:  I'm going to object.  I'm going

14   to object.  I'm going to object.  It's attorney-client

15   privilege between Burton Neil and Midland.

16            I'm going to ask that she doesn't respond to

17   that question.

18   BY MR. SOUMILAS:

19       Q.    Are you aware that the affidavits that Midland

20   Credit Management uses in bringing collection lawsuits

21   against consumers are generated and prepared by the You

22   Got Claims computer system?

23            MR. SCHWARTZ:  I'm --

24            THE WITNESS:  I don't believe that's accurate.

25   I don't believe that the You Got Claims prepares the

**ANGELIQUE ROSS**

1   affidavits.

2   BY MR. SOUMILAS:

3       Q.   Does -- does somebody actually type those

4   affidavits out?

5       A.   To my knowledge, there is templates used and

6   information is -- there is specific account-related

7   information that's populated into it.

8            So if -- if you're asking me if someone is

9   manually typing every single affidavit, no, I don't

10  believe that to be the case.

11      Q.   So let's make sure I understand this.  The --

12  there is a template so that all affidavits use certain

13  boilerplate language, if you will?

14      A.   Yes.  They can vary, but yes.

15      Q.   They can vary from court to court if it's

16  determined that a particular court needs different type

17  of language in these affidavits, correct?

18      A.   That could be one factor.  It could be state

19  related as well.

20      Q.   But in Philadelphia, for example, there is a

21  form for the particular affidavit to be used in

22  Philadelphia that's used over and over and over again,

23  correct?

24      A.   Yes.

25      Q.   And when you say that data is populated into

**ANGELIQUE ROSS**

1      A.    Yes.

2      Q.    Okay.  Now, are you aware that at some point

3   Midland Credit Management terminated the lawsuit against

4   Ms. Montgomery?

5           MR. SCHWARTZ:  Objection as to form.

6           You can answer, if you can.

7           THE WITNESS:  Yes, I know it stopped at some

8   point.

9   BY MR. SOUMILAS:

10      Q.    That's what I meant.  I meant that at some

11   point, the lawsuit stopped.

12           Do you know how it stopped?

13      A.    I believe after the documents provided by

14   Ms. Montgomery related to fraud were received, then

15   there was a request made by Midland to stop.

16      Q.    When did Midland make that request?

17      A.    That would have been -- looks like 7/28/2011.

18      Q.    I'm sorry.  When was that?

19      A.    7/28/2011.

20      Q.    That would be July 28th, 2011?

21      A.    Yes.

22      Q.    And what are you looking at to come up with

23   that answer?

24      A.    I'm looking at Ross 5, the account notes.

25           MR. SCHWARTZ:  Bates stamped Midland 9, 10.

**ANGELIQUE ROSS**

1    BY MR. SOUMILAS:

2        Q.    Where the entry says, "Follow up with firm.

3    Suit has been dismissed"?   There?

4        A.    Actually, below that.   So before that, there

5    was a -- once the information was received by Midland,

6    then the request was sent back.   It says, "Rule."   The

7    very last line of the entry on 7/28/2011 at 10:58 says,

8    "Will recall account from firm."

9        Q.    Okay.   And who at Midland Credit Management

10   made that decision to recall the account?

11       A.    I cannot remember who specifically did it, but

12   their collector code is ERR.

13       Q.    You have not spoken with that person in

14   connection with this case?

15       A.    No.

16       Q.    Am I correct that a little bit more than a

17   month later Midland received a refund from the issuer

18   for this account?

19       A.    Yes.

20       Q.    So that would have been that entity that sold

21   it to you, the Atlantic -- I'm sorry.   I forget their

22   name.

23           MR. SCHWARTZ:   Atlantic Credit Finance.

24   BY MR. SOUMILAS:

25       Q.    Is that right?   Atlantic Credit Finance?

**ANGELIQUE ROSS**

1    A.    Yes.

2    Q.    All right.  And am I correct that at some

3    point, again, about a month, month and a half later,

4    Midland Credit Management wrote a letter to

5    Ms. Montgomery dated September 15th, 2011?

6    A.    Let's see.  Yes.

7    Q.    If it helps you, I think it's -- we have a copy

8    of it within Ross 8 at Montgomery 48.

9          Does that help you?

10   A.    Yes.

11   Q.    All right.  And in that letter, Midland Credit

12   Management says that "The above referenced Capital One

13   account was transferred to MRC Receivables Corp. and

14   referred to Midland Credit Management."

15         What's MRC Receivables Corp.?

16   A.    That was another purchasing entity for --

17   Q.    I thought you told me in this case the

18   purchasing entity was Midland Funding for this

19   particular accounts; is that correct?

20   A.    I -- I don't know if I said that Midland

21   Funding purchased it, but...

22   Q.    But what?

23   A.    It -- MRC Receivables was another entity that

24   purchased accounts at the time.  I believe all have been

25   transferred over to Midland Funding.

**ANGELIQUE ROSS**

1       And then the next sentence says that "MCM" -- I

2   guess that's Midland Credit Management -- "has since

3   been informed that this account was transferred in error

4   and has been recalled by Capital One."

5       That's not a true statement either, is it?

6   A.   It would have been recalled by Atlantic Credit.

7   Q.   Right.

8       Capital One didn't do any recalling, correct?

9   A.   Correct.

10  Q.   And -- and the reason why Midland Credit

11  Management terminated the lawsuit and sent the account

12  back to Atlantic Credit for a refund is because the

13  account was a result of fraud; isn't that correct?

14      MR. SCHWARTZ:   Objection as to form.

15      You can answer, if you can.

16      THE WITNESS:   Well, I guess more specifically

17  the reason it was recalled is because we received proof

18  that it was the result of fraud.

19  BY MR. SOUMILAS:

20  Q.   Okay.  So it wasn't an error that it was sent.

21  It was a determination made that the account was a

22  result of fraud, correct?

23  A.   Well, we believe if it was transferred to us

24  and already fraud, then that would be an error.

25  Q.   Okay.  Now, if you look within Ross 5 at

ANGELIQUE ROSS

1    assigned to that code.

2        Q.   All right.  But there is a way of deleting

3    accounts due to fraud as well, correct?

4        A.   I believe so, yes.

5        Q.   You are familiar -- very familiar with credit

6    reporting, correct?

7        A.   I'm familiar with it, yes.

8        Q.   Yes.  And the reason why this account was

9    terminated was because of substantiation of fraud,

10   correct?

11       A.   Correct.

12       Q.   Are you aware that Capital One had made a

13   determination in 2009, two years earlier, that this

14   account was an account that Ms. Montgomery was not

15   responsible for?

16       A.   Based on a letter, yes.

17       Q.   Okay.  Are you aware that the lawsuit which

18   was --

19       A.   Can we take a small break?

20       Q.   We're going to take one in just a minute,

21   because we are about done with the chronology and this

22   is a perfect time to take a break.

23            But I wanted to ask you whether you knew that

24   the attorneys who dismissed the lawsuit on Midland

25   Funding's behalf dismissed it without prejudice.

ANGELIQUE ROSS

1      A.    Yes, I'm aware.

2      Q.    Do you understand that to mean that

3  Ms. Montgomery could get sued again for that same debt

4  because the suit was dropped without prejudice?

5          MR. SCHWARTZ:   Objection as to form.

6  BY MR. SOUMILAS:

7      Q.    What's your understanding of that?

8      A.    My understanding is yes, it's possible.  But

9  since we have the account and we shut it completely

10  down, we don't re-enable those accounts or do any

11  further collection activity after that happens.

12     Q.    And are you aware that the attorneys who

13  handled the lawsuit never bothered to tell

14  Ms. Montgomery that she wasn't required to show up to

15  court to defend herself on the scheduled court date?

16     A.    I don't know that I'm aware of that.

17     Q.    Okay.

18     A.    I don't recall.

19          MR. SOUMILAS:   This is a good time for a break.

20          THE WITNESS:   Okay.

21          MR. SOUMILAS:   Let's go off the record.

22          VIDEO TECHNICIAN:   This ends Media Number 1 in

23  the deposition of Angelique Ross.

24          Time off the record 10:26 a.m.

25          (Recess.)

**ANGELIQUE ROSS**

1   provided by the creditor when Midland Funding acquired

2   the subject debt in December of 2010 showing that the

3   Capital One debt was due and owing for Plaintiff."

4          And then it says, "See a copy of the Capital

5   One loan attached as Exhibit A to the answer."

6          Do you see that?

7   A.    Yes.

8   Q.    So you would agree with me that at least as of

9   April 2012, Midland denied that Ms. Montgomery was not

10  responsible for this debt?

11  A.    I -- I'm not reading it that way.  I'm reading

12  it as at the time -- at the time information was

13  provided during -- during that time, we relied on the

14  information from the creditor.

15  Q.    All right.  Well, the answer speaks for itself.

16          Speaking -- sitting here today, as a

17  representative of both Midland Credit Management and

18  Midland Credit Funding, is it your position that

19  Ms. Montgomery owed that Capital One debt?

20  A.    Is it our position now that she owed the debt?

21  Q.    Is it your position sitting here today,

22  correct?

23  A.    No, not today.

24  Q.    Okay.  Your position today is that she was a

25  victim of fraud?

**ANGELIQUE ROSS**

1      A.   I believe just Capital One's letter said that

2   she didn't owe the debt.  And, yeah, she did file a

3   police report, so I believe that to be true.

4      Q.   Okay.  And given that position, would it also

5   be true that Midland Funding and Midland Credit

6   Management will not sue Ms. Montgomery again for this

7   debt and have no intention of doing so?

8      A.   That's correct.

9      Q.   Okay.  You would agree with me that, according

10  to your records, this was a consumer debt, correct?

11     A.   I -- I believe so.

12     Q.   That's what it says right there in Ross 5.

13  Those are Midland's account records for this account at

14  Midland 8, please.  Page 8 on the top left-hand side, it

15  says, "Product type:  General consumer loan."

16     A.   (Inaudible.)

17     Q.   I'm sorry?

18     A.   Yes, it says that.

19     Q.   All right.  Now, having gone through the

20  chronology that we've gone to with respect to this

21  account, do you believe that Midland Credit Management

22  followed its usual policies and procedures in attempting

23  to collect monies for the Capital One debt from

24  Ms. Montgomery?

25     A.   Yes.  And are you referring to the phone calls

**ANGELIQUE ROSS**

1    Management ever requested the original application for

2    this Capital One account at any time?

3         A.   I haven't personally seen it, but that doesn't

4    mean that it wasn't requested.

5         Q.   Okay.  Well, speaking as you are as a corporate

6    representative for both Midland Credit Management and

7    Midland Funding, are you aware of any record that shows

8    that anyone from the two Midland businesses ever

9    requested the original application for this Capital One

10   account?

11        MR. SCHWARTZ:  Objection as to form.

12   BY MR. SOUMILAS:

13        Q.   You can answer it.

14        A.   I haven't seen anything, no.

15        Q.   Am I correct that Midland Credit Management and

16   Midland Credit Funding never obtained any statements

17   from Capital One like mostly billing statements

18   concerning this account?

19        A.   I don't believe so, no.

20        Q.   Am I correct that Midland Credit Management and

21   Midland Funding never obtained any affidavit of fraud

22   that Ms. Montgomery provided to Capital One?

23        A.   As far as I know, not -- not from Capital One

24   or Atlantic.  Just what was provided by Ms. Montgomery

25   later.

**ANGELIQUE ROSS**

1  Q.   Am I correct that neither Midland Credit

2  Management or Midland Funding obtained from Capital One

3  or Atlantic any dispute history concerning with a

4  Capital One account?

5  A.   No, we did not.

6  Q.   And am I correct that the Midland businesses

7  did not obtain any police report from either Capital One

8  or Atlantic concerning this account?

9  A.   No, we didn't.

10  Q.   Are you aware of any other documentation that

11  Midland Credit Management or Midland Funding obtained

12  from either Atlantic Credit or Capital One concerning

13  this account other than the front and back of this check

14  that we see here within Ross 10?

15  A.   No, I'm not aware of it.

16  Q.   So this is the only item of information

17  concerning the account at issue that you obtained from

18  either Capital One or Atlantic, correct?

19  A.   Well, we did receive information from them

20  related to the account, but not like in this form.  So

21  there would have been account information that we used

22  to put -- load the account into our system.

23  Q.   Right.

24       So remember earlier in reference to the bill of

25  sale, it had reference "unadulterated electronic

**ANGELIQUE ROSS**

1    records" concerning the account?

2        A.    Uh-huh.

3        Q.    "Yes"?

4        A.    Yes.

5        Q.    So you don't have any unadulterated electronic

6    records about the application, the statements, the

7    billing history, the dispute history, nothing, correct?

8        A.    Not to my knowledge, we don't have that.   We

9    just have other -- the other information that was given

10   to us in the electronic file.

11       Q.    So this was electronic information that was

12   obtained at the time of the purchase of the account,

13   correct?

14       A.    Yes.

15       Q.    And that would be information about who

16   allegedly owes the account, name, address, that type of

17   personal identifying information?

18       A.    Yes, that's some of it.

19       Q.    The amount, the account number, correct?

20       A.    Correct.

21       Q.    What else?

22       A.    Open date.  Last payment date, if there was

23   one.  Sometimes a phone number.  That's what I can think

24   of offhand.

25       Q.    Okay.  Let's move on to the next page of

**ANGELIQUE ROSS**

1    might just want to refer to that.  It might be easier.

2        A.    Okay.  I have it.

3        Q.    You have it?

4        A.    Yes.

5        Q.    Now, is it your understanding that this

6    particular affidavit was prepared in the normal course

7    of how Midland prepares these affidavits?

8        A.  . Yes.

9        Q.    And it looks like it was signed March 11th,

10   2011; is that correct?

11       A.    Yes.

12       Q.    Now, am I also correct that according to

13   Midland's own internal collection detail records for the

14   Capital One account, which are in Ross 5 if you need to

15   reference that, am I correct that Midland had a

16   telephone dispute from January 17, 2011 advising it that

17   Ms. Montgomery believed that this account was fraud and

18   identity theft, according to -- to the notes in the

19   system?

20       A.    Yes.

21       Q.    Are you aware that in preparing this

22   verification on March 11th, 2011, whether Ms. Hoffman

23   even looked at the account notes in Midland Credit

24   Management's own computer system concerning this

25   account?

**ANGELIQUE ROSS**

1      A.    I can't answer what exactly she did.

2      Q.    Okay.  You don't have any indication that --

3  you've never spoken with Ms. Hoffman, correct?

4      A.    No.

5      Q.    Have you read the testimony that she gave in

6  this case, a transcript of it?

7      A.    No.

8      Q.    Speaking for the Midland defendants today, do

9  you know whether Ms. Hoffman looked at any of the

10  collection detail notes in Midland's own records before

11  signing the affidavit?

12      A.    Well, she signed that she had access to and

13  reviewed the records.  So, I mean, that's the only --

14  that's the basis I have to -- to say that.  I have not

15  talked to her specifically.

16      Q.    I know that she signed that she did them.  I'm

17  asking whether, as a matter of fact, you know that she,

18  in fact, reviewed the -- the account detail records?

19      A.    I only have what's in front of me in terms of

20  what she signed and notarized.

21      Q.    So you don't know one way or the other?

22      A.    Well, based on her statement under penalty of

23  perjury, she did.  But I didn't ask her specifically or

24  talk to her about what she reviewed.

25      Q.    Okay.  Do you know whether Ms. Hoffman reviewed

1    STATE OF CALIFORNIA    )

                    :   ss.

2    COUNTY OF SAN DIEGO    )

3        I, Julie A. McKay, Certified Shorthand Reporter in

4    and for the State of California, Certificate No. 9059,

5    do hereby certify:

6        That the witness in the foregoing deposition was by

7    me first duly sworn to testify the truth, the whole

8    truth, and nothing but the truth in the foregoing cause;

9    that the deposition was taken before me at the time and

10   place herein named; that said deposition was reported by

11   me in shorthand and transcribed, through computer-aided

12   transcription, under my direction; and that the

13   foregoing transcript is a true record of the testimony

14   elicited at proceedings had at said deposition.

15       I do further certify that I am a disinterested

16   person and am in no way interested in the outcome of

17   this action or connected with or related to any of the

18   parties in this action or to their respective counsel.

19       In witness whereof, I have hereunto set my hand

20   this

21

22

                         Julie A. McKay

23                       CSR No. 9059

24

25