# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSLYVANIA

---------------------------

ANGELINE MONTGOMERY,

          Plaintiff,

   vs.                Civil Action No. 12-1244

MIDLAND CREDIT MANAGEMENT

CO., et al.,

          Defendants.       ORIGINAL

---------------------------


VIDEO DEPOSITION OF

ASHLEY HOFFMAN

* * *

February 28, 2013


Reported by: Lisa Peterson


SUMMIT COURT REPORTING, INC.
Certified Court Reporters & Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
425 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

ASHLEY HOFFMAN

1    represent the plaintiff in this matter, Angeline

2    Montgomery.

3                       MR. SCHWARTZ:   I am Andrew Schwartz

4    from the law firm of Marshall, Dennehey, Warner,

5    Coleman & Goggin and I represent the defendant

6    Midland Credit Management, as well as Burton Neil &

7    Associates.

8                       VIDEOGRAPHER:  Will the court

9    reporter please swear in the witness.

10                           * * *

11                    ASHLEY HOFFMAN,

12                being first duly sworn,

13                 testified as follows:

14                           * * *

15            EXAMINATION BY MR. SOUMILAS

16                           * * *

17         Q.      Ms. Hoffman, good afternoon.

18         A.      Good afternoon.

19         Q.      Would you please state your full

20    name for the record, please.

21         A.      Ashley Marie Hoffman.

22         Q.      Who do you work for, Ms. Hoffman?

23         A.      I work for Midland Credit

24    Management.

## ASHLEY HOFFMAN

1          Q.        What is your position at Midland

2     Credit Management?

3          A.        I'm a senior legal specialist.

4          Q.        Where is your office located?

5          A.        Our office is located at 16

6     McLeland Road, St. Cloud, Minnesota, 56303.

7          Q.        Is that where you are today?

8          A. ·      Yes, it is.

9          Q.        Did you understand that today you

10    are giving sworn testimony under penalty of perjury

11    in a lawsuit pending in the United States District

12    Court for the Eastern District of Pennsylvania

13    brought by my client Ms. Montgomery against your

14    employer Midland Credit Management and also a related

15    entity called Midland Funding and their attorneys

16    Burton Neil & Associates?

17         A.        Yes.

18         Q.        And do you understand that

19    Ms. Montgomery's claim is that Midland Credit

20    Management should not have attempted to collect an

21    old Capital One debt from her because she was not

22    responsible for it and also she should not have been

23    sued for that debt by Midland Funding?

24         A.        Yes, that is what I was told.

**ASHLEY HOFFMAN**

1    past fall but the previous year.

2            Q.      Between 2009 and the March 2011

3    time frame when you would have signed this affidavit

4    that we have here as Hoffman 1, you were a legal

5    specialist, correct?

6            A.      Correct.

7            Q.      And what did you do in that

8    capacity for your employer Midland Credit Management?

9            A.      I processed affidavits.

10           Q.      Did you do anything else?

11           A.      I also had some other

12   responsibilities doing work with trial witness and

13   then other small projects here and there but my main

14   duty was to process affidavits.

15           Q.      When you say to process affidavits,

16   do you mean to sign them?

17           A.      To review them and verify the

18   information and then sign them if they are correct.

19           Q.      So we are talking about affidavits

20   like the documents we have here as Hoffman 1 which

21   says "Verification" at the very top, is that

22   correct?

23           A.      That's correct.

24           Q.      As a legal specialist how many of

**ASHLEY HOFFMAN**

```
 1    these affidavits did you process per day in the 2011
 2    time frame when you processed this one?
 3              A.        I couldn't even give you an
 4    estimate of how many I did in a day.  It's dependent
 5    on a lot of different variables.
 6              Q.        Could it have been as many as 200
 7    in any given day?
 8              A.        It could have been.
 9              Q.        Could it have been as many as 300
10    in any given day?
11              A.        Not likely but it's possible.
12              Q.        Was it in the hundreds per day?
13              A.        It could have been less than 100
14    but it could have been in the 100s.
15              Q.        You work full time for Midland
16    Credit Management?
17              A.        Yes.
18              Q.        And you worked full time between
19    2009 and 2011 when you process these affidavits?
20              A.        Yes, I did.
21              Q.        Do you still process them today?
22              A.        I do.
23              Q.        Did you process any yesterday?
24              A.        I did not.
```

**ASHLEY HOFFMAN**

1          Q.     That is no longer your primary

2    responsibility, I take it?

3          A.     My responsibility is still with

4    processing affidavits.  I'm more now in a quality

5    assurance role and answering questions for our

6    affiants regarding the affidavits.

7          Q.     Let's talk about the 2011 time

8    frame when you processed this particular affidavit

9    for Ms. Montgomery.  Would you please take us -- Let

10   me be more specific.  Did you write or type these

11   affidavits up yourself?

12         A.     No.

13         Q.     Did they come, if you will,

14   prepared for you to sign?

15         A.     Yes.

16         Q.     They had all the information in

17   them before you ever saw them for the first time,

18   correct?

19         A.     That's correct.

20         Q.     How did they come to your

21   attention?  How did you know you needed to process

22   one of them?

23         A.     They get sent -- the firm sends a

24   request to Midland and then they get printed, they go

**ASHLEY HOFFMAN**

1    through our Thunderhead program and they get printed

2    in the affiant's name and they get distributed to

3    each of the affiants.

4              Q.    When you say the firm, would that

5    be the law firm that Midland Credit Management would

6    have used to bring the lawsuit against the person who

7    was supposed to have owed the debt?

8              A.    That's correct.

9              Q.    Is this particular form that we see

10   here as Hoffman 1 a form prepared by the Burton Neil

11   & Associates law firm in the Philadelphia area?

12             A.    No.  This is prepared by our

13   system.

14             Q.    When you say your system, you mean

15   the computer system?

16             A.    Yes.

17             Q.    You mention a name for it.  What is

18   it called?

19             A.    Thunderhead.

20             Q.    Thunderhead is the computer system

21   that knows how to put this together on its own?

22             A.    Thunderhead is a program in which

23   templates are loaded and the firm sends the requests

24   through YGC and then they go to Thunderhead which

**ASHLEY HOFFMAN**

1   generates the affidavit based on preprogrammed

2   templates.

3          Q.      Is YGC a separate computer program

4   your employer also uses for these affidavits?

5          A.      YGC is an entity we work with.

6   It's kind of the mediary between Midland and the law

7   firms.

8          Q.      What does YGC stand for, please?

9          A.      You've Got Claims.

10         Q.      You've Got Claims is an entity

11  where the law firm can make a request for you to

12  receive one of these affidavits, is that right?

13         A.      That's correct.

14         Q.      Then Thunderhead which is Midland

15  Credit Management's computer program knows how to

16  prepare it based on a form and have it print it out

17  at your office, is that correct?

18         A.      Yes.

19         Q.      That is what happened in the 2011

20  time frame when you would have processed this

21  particular affidavit for Ms. Montgomery, is that

22  right?

23         A.      That's correct.

24         Q.      Was it your routine at the time to

**ASHLEY HOFFMAN**

```
 1    read the affidavit, read every word of the affidavit?

 2              A.      Yes.

 3              Q.      Was it your routine to sign it?

 4              A.      Yes.

 5              Q.      There's also a notary public

 6    signature immediately below yours.  Do you see

 7    that?

 8              A.      I do.

 9              Q.      Did you sign this affidavit in

10    front of this notary public?

11              A.      Yes, I did.

12              Q.      Is this a notary public you know,

13    somebody in the office?

14              A.      Yes.  It's someone I work with.

15    She is also a legal specialist.

16              Q.      You go in front of her and you sign

17    these affidavits?

18              A.      Yes.

19              Q.      Do you do it one at a time or do

20    you do them as a stack?

21              A.      Typically we do them as a stack.

22              Q.      How many would you sign as a stack

23    at any one time before this public notary?

24              A.      That depends how many affidavits I
```

**ASHLEY HOFFMAN**

1   processed in that day.

2           Q.      A little bit more information about

3   you, Ms. Hoffman.  You are not an attorney, are you?

4           A.      No.

5           Q.      And do you have any legal training

6   or education?

7           A.      Yes, I do.

8           Q.·     What is that, please?

9           A.      I graduated from the Minnesota

10  School of Business in 2008 with a paralegal studies

11  degree, an associate's degree in paralegal studies.

12          Q.      Other than your paralegal degree,

13  do you have any other training or education?

14          A.      I did a short internship at a law

15  firm in Little Falls, Minnesota for maybe six

16  months.

17          Q.      Do you have any particular training

18  or education in investigating claims of fraud or

19  identity theft?

20          A.      No.

21          Q.      Have you given testimony under oath

22  like you are today ever before in your life?

23          A.      Yes, I have.

24          Q.      How many times, please?

**ASHLEY HOFFMAN**

1          A.          That sounds about right.

2          Q.          Are you aware in each one of those

3     lawsuits in 2012 the claim was that you signed a

4     false and misleading affidavit on behalf of your

5     employer Midland Credit Management?

6          A.          Yes.

7          Q.          Let's go back to Hoffman 1 for a

8     moment, please.  Am I correct, Ms. Hoffman, that you·

9     don't as you sit here today have any specific

10    recollection of working on this particular affidavit

11    in March of 2011?

12         A.          Other than reviewing it in

13    preparation for this deposition, I would not have any

14    recollection.

15         Q.          I take it you work on hundreds of

16    these affidavits per day, so any one doesn't just

17    stand out in your memory from two years ago, is that

18    accurate?

19                      MR. SCHWARTZ:  Objection as to

20    form.  Mischaracterizing the testimony, prior

21    testimony.

22         Q.          I will ask it a different way.  Is

23    it correct that you don't have any specific

24    recollection of the circumstances of Ms. Montgomery's

**ASHLEY HOFFMAN**

1    affidavit that we have here as Hoffman 1?

2            A.      No, other than what I have reviewed

3    in preparation for this deposition.

4            Q.      Do you have any reason to believe

5    this particular affidavit was not prepared by you in

6    the routine manner in which you would have prepared

7    affidavits back in March of 2011?

8            A.      No.

9            Q.      So you think you would have gone

10   through the standard routine in preparing Hoffman 1

11   like you would have in preparing affidavits related

12   to any other person, correct?

13           A.      That's correct.

14           Q.      You don't know Ms. Montgomery

15   personally in any way, correct?

16           A.      Correct.

17           Q.      You have never spoken with her,

18   correct?

19           A.      Not that I can recall.

20           Q.      You have never corresponded with

21   her, correct?

22           A.      Correct.

23           Q.      Let's go through this affidavit

24   that we have in front of you as Hoffman 1.  You would

**ASHLEY HOFFMAN**

1      agree with me that the language in this affidavit is

2      standard language or form language except for the

3      name of the bank and the account number and the

4      consumer that allegedly owes the debt, is that

5      correct?

6              A.      That is correct.

7              Q.      In other words, in the first

8      paragraph your affidavit always says that you have

9      personal knowledge of the account records.  Do you

10     see that in paragraph one?

11             A.      Yes, I do.

12             Q.      In the case of Ms. Montgomery is it

13     correct that before signing this affidavit in March

14     of 2011, that you did not review the application with

15     Capital One which initiated this account, opened up

16     the account?

17             A.      I did not review that document.

18             Q.      And that would be consistent with

19     your routine at the time, correct?

20             A.      Yes.  My routine did not require me

21     to look at this document when I prepared this

22     affidavit.

23             Q.      You would not have looked at any

24     statements from Capital One to a person on an address

**ASHLEY HOFFMAN**

1      of whoever opened this account, monthly billing

2      statements, correct?

3              A.      For this template, no, I would not

4      have looked at any of the statements.

5              Q.      Again the template is the one that

6      we have here as Hoffman 1, correct?

7              A.      Correct.

8              Q.      That is the one that is used in

9      Philadelphia to bring lawsuits against consumers who

10     allegedly owe a debt, correct?

11             A.      Correct.

12             Q.      You would not have looked at any

13     customer service notes that Capital One may have had

14     concerning this particular account, is that correct?

15             A.      That's correct.

16             Q.      Again that is consistent with your

17     routine at the time, correct?

18             A.      Correct.

19             Q.      You would not have looked at any

20     dispute history that Capital One may have included in

21     this account concerning any dispute that

22     Ms. Montgomery may have made to Capital One directly,

23     is that correct?

24             A.      Yes.

**ASHLEY HOFFMAN**

1          Q.     Yes, it is correct?

2          A.     Yes, that's correct.

3          Q.     Again that is consistent with your

4     routine at the time?

5          A.     Yes.

6          Q.     Continuing further in paragraph one

7     of that affidavit you describe the account.  You say

8     that it was Plaintiff, that would be your employer,

9     is the current -- Who is Plaintiff, do you know?

10         A.     Yes.  The plaintiff would have been

11    Midland Funding.

12         Q.     Who is Midland Funding in relation

13    to your employer?

14         A.     Midland Funding is -- Midland

15    Credit Management is a subsidiary of Midland Funding

16    both under the umbrella of Encore Capital System --

17    Encore Capital Group.

18         Q.     When you say here that Plaintiff is

19    the current owner of and/or successor to the

20    obligations sued upon and was assigned all the

21    rights, you are talking about Midland Funding having

22    obtained some interest in this Capital One account?

23         A.     Yes.

24         Q.     Was Midland Funding a successor or

**ASHLEY HOFFMAN**

1          Q.       You don't know who assigned it to

2    Midland Funding, do you?

3          A.       I would have known at the time

4    because it would have shown up on the screen I was

5    looking at.

6          Q.       Do you know who Atlantic Credit &

7    Finance is?

8          A.       Yes, I do.

9          Q.       Who is that?

10         A.       It's a debt seller we do business

11   with.

12         Q.       Do you know what type of business

13   you do with them?

14         A.       Yes.  We purchase accounts from

15   them.

16         Q.       Do you know whether this particular

17   account was purchased by Midland Funding not from

18   Capital One but instead from Atlantic Credit &

19   Finance?

20         A.       Yes.

21         Q.       Yes, it was?

22         A.       Yes, it was.

23         Q.       In preparing this affidavit did you

24   look at any Atlantic Credit & Finance records

**ASHLEY HOFFMAN**

1    concerning this particular account?

2         A.    No, I did not.

3         Q.    That is again consistent with your

4    routine you would not look at such records, correct?

5         A.    Correct.

6         Q.    If there was a billing history by

7    Atlantic Credit & Finance or anyone on the behalf of

8    Atlantic Credit & Finance to Ms. Montgomery, you

9    would know about that before signing this affidavit,

10   correct?

11        A.    I wouldn't know directly about it

12   but we have processes in place where if we purchased

13   such accounts that were disputed or were unqualified

14   accounts, that we have put-back revisions in the

15   contracts we have with the selling entities, and if

16   they were to put-back this account and return it to

17   the seller, the account would be closed and it would

18   not show up on our validation screen or AMS, the

19   screen I'm looking at when I'm processing affidavits,

20   and my only option for this affidavit would be to

21   fail it.  So at that point I would know that there

22   was a dispute or some form of dispute that caused us

23   to close this account.

24        Q.    So the seller would effectuate this

**ASHLEY HOFFMAN**

1    put-back as you put it on their own, correct?

2          A.    I'm not exactly sure how it works.

3          Q.    At any rate, you would not look at

4    any history or dispute history from Atlantic Credit &

5    Finance in preparing one of these affidavits,

6    correct?

7          A.    That's correct.

8          Q.    The next sentence in·paragraph one

9    says that, "I have access to and review the records

10   pertaining to the account."  Do you see that?

11         A.    Yes, I do.

12         Q.    The immediately preceding sentence,

13   "The account is defined as that old Capital One

14   account that ends in account 3595."  Do you see that?

15         A.    Yes.

16               MR. SCHWARTZ:  Objection as to

17   form.

18         Q.    That is the account we are talking

19   about, the old Capital One account, is that correct?

20         A.    Yes, we are talking about the

21   Capital One account ending in 3595.

22         Q.    When you say, "I have access and

23   review the records pertaining to the account, am I

24   correct you did not have access and you did not

**ASHLEY HOFFMAN**

1    review any documents whatsoever from Capital One?

2              A.      I did have access.  I did not

3    review those documents in relation to this affidavit

4    or to this account but I did review the pertinent

5    account records that allowed me to verify all the

6    information within this document.

7              Q.      We are going to get to that in a

8    moment but as far as the Capital One application, the

9    statements, the dispute history, you did not review

10   any of those things, correct?

11             A.      That's correct.

12             Q.      That is consistent with your

13   routine at the time as to how you would have verified

14   these affidavits, is that also correct?

15             A.      Yes.

16             Q.      In terms of pertinent account

17   records, you would not have reviewed any history or

18   dispute history from Atlantic Credit & Finance

19   either, is that correct?

20             A.      Yes, that's correct.

21             Q.      Again that is consistent with your

22   routine in preparing these affidavits in March of

23   2011, correct?

24             A.      Correct.

**ASHLEY HOFFMAN**

1          Q.      You did look at a computer screen

2     of a Midland Credit Management computer screen that

3     said that Ms. Montgomery owed this money, correct?

4          A.      Correct.

5          Q.      Other than looking at this computer

6     screen internally at Midland Credit Management, am I

7     correct you did not review any other records

8     concerning the old Capital One account?

9          A.      That's correct.

10         Q.      Again that is consistent with your

11    routine at the time, correct, Ms. Hoffman?

12         A.      Yes, that's correct.

13         Q.      The next paragraph you say that the

14    defendant opened the account with Capital One

15    sometime in 2007, it looks like.  Am I correct the

16    date you have there is November 6?

17         A.      That's correct.

18         Q.      The defendant would have been

19    Ms. Montgomery?

20         A.      Yes.

21         Q.      You don't know that Ms. Montgomery,

22    in fact, opened this account with Capital One on

23    November 6, 2007, do you?

24         A.      That is what the account records

**ASHLEY HOFFMAN**

1          Q.      So every one of the accounts you

2     would have on your computer screen would relate to

3     some consumer who allegedly owes a debt, correct?

4          A.      Correct.

5          Q.      You did not investigate with

6     respect to Ms. Montgomery as to whether this account

7     was opened fraudulently, correct?

8          A.      Correct.  I just reviewed the

9     account records on the validation screen.

10          Q.      You would never have conducted some

11     type of a fraud investigation before signing one of

12     these affidavits, correct?

13          A.      Not for an affidavit of this type.

14     It doesn't have language referring to any kind of

15     disputes or anything of that nature but if it had, I

16     would have investigated further.

17          Q.      Would you have access to all of

18     Midland Credit Management's, their own internal

19     records concerning this account before you were to

20     sign an affidavit like this on March 11, 2011?

21          A.      I have access to the pertinent

22     records.  So I don't know if I have access to all of

23     them but I have access to all the records that I

24     would need to look at in order to verify a statement

**ASHLEY HOFFMAN**

1          A.      I don't know.

2          Q.      With respect to the time you signed

3    it on March 11, 2011, you believed the information

4    you saw in the validation screen was accurate,

5    correct?

6          A.      Correct.

7          Q.      That is why you signed this

8    affidavit for no other reason, correct?

9          A.      That's correct.

10         Q.      When you get these affidavits

11   printed out of the computer system and sent to you,

12   do you ever change any of the words around or make

13   any edits to them?

14         A.      No.

15         Q.      The answer was no?

16         A.      The answer is no.

17         Q.      Would it be accurate to say in the

18   years -- You have worked there about four years now

19   at Midland Credit Management?

20         A.      A little over three years.

21         Q.      So you must have signed tens of

22   thousands of these affidavits in that time frame,

23   would you agree?

24         A.      I don't know how many affidavits I

**ASHLEY HOFFMAN**

```
 1                    A.        Now we are talking about all
 2       affidavits?
 3                    Q.        All of these affidavits that you
 4       signed for Midland Credit Management in support of a
 5       lawsuit to be brought against a consumer like the one
 6       we have here in Hoffman 1?
 7                    A.        Like the one we have here I would
 8       never have signed or I would never have changed any
 9       of the information within the affidavit.
10                    Q.        Are you aware that a federal judge
11       in 2009 found that Midland Credit Management's use of
12       affidavits based on personal knowledge like the one
13       we have here as Hoffman 1 were false and misleading
14       under a federal law known as the Fair Debt Collection
15       Practices Act?
16                    MR. SCHWARTZ:  I'm going to object
17       as to form.  You said like affidavit Exhibit Hoffman
18       1 and it's not like affidavit Exhibit Hoffman 1.  If
19       you want to rephrase the question, that is fine.
20       The objection is as to form.
21                    Q.        I will break it down.  Are you
22       aware a federal judge in 2009 found that Midland's
23       affidavit, Midland Credit Management's, using the
24       specific phrase that they are based on personal
```

**ASHLEY HOFFMAN**

1     knowledge was found to be false and misleading under

2     a federal law known as the Fair Debt Collection

3     Practices Act?

4          A.     I'm aware of the case, yes.

5          Q.     As far as you know, the phrase that

6     we see here in Hoffman 1 that says it's based on --

7     the information is based on your personal knowledge

8     is that language that continues to be used by Midland

9     in affidavits that you sign in 2013?

10               MR. SCHWARTZ:  Objection as to

11    form.

12         A.     Can you please rephrase that.

13         Q.     Are you aware that, for example, in

14    2010, a year after the federal judge made that

15    finding about Midland Credit Management's affidavits,

16    you continued -- you personally -- continued to sign

17    affidavits that were based on personal knowledge and

18    filed with courts in collection matters?

19         A.     The affidavits that I signed based

20    on personal knowledge were based on personal

21    knowledge of the account records.  I don't know

22    exactly what the language in the affidavits prior to

23    the 2009 ruling stated but the ones that I signed

24    state that I have personal knowledge of the business

**ASHLEY HOFFMAN**

```
 1    records.

 2           Q.      That language that you have

 3    personal knowledge of the pertinent account records,

 4    does that sound correct?

 5           A.      Are you reading off the affidavit?

 6           Q.      That is what it says in Hoffman 1,

 7    "I have access to the pertinent account records."  Do

 8    you see that?

 9                   MR. SCHWARTZ:  Objection.  If you

10    are going to read, you should read in its entirety.

11           Q.      Paragraph one, Ms. Hoffman, do you

12    see that you say that you have access to pertinent

13    account records for Midland Credit Management,

14    servicer on the account on behalf of the plaintiff?

15           A.      Yes.

16           Q.      And the very next sentence says

17    that you are a competent person over age 18 and you

18    make the statements herein based upon your personal

19    knowledge.  Do you see that?

20                   MR. SCHWARTZ:  Of those account

21    records.

22           Q.      Of those account records, correct.

23           A.      Yes, I see that.

24           Q.      My question simply is whether that
```

**ASHLEY HOFFMAN**

1   language we see in paragraph one is language that you

2   continue using in 2010 in affidavits you signed and

3   filed with courts?

4           A.      Yes.

5                   MR. SCHWARTZ:  Objection as to

6       form.

7           Q.      You continue to use that exact same

8   language that we see in paragraph one of the Hoffman

9   affidavit in 2011 in affidavits that were filed with

10  courts, correct?

11          A.      That's correct.

12          Q.      You continue to use that exact same

13  language that we see in Hoffman 1, the first

14  paragraph of Hoffman 1, in affidavits that you signed

15  and filed with courts in 2012, isn't that correct?

16          A.      Correct.

17          Q.      You still use that exact same

18  language in affidavits that you sign and have filed

19  with courts this year in 2013, correct?

20          A.      Correct.

21          Q.      After you were personally sued in

22  2012 three times for allegedly filing false and

23  misleading affidavits on behalf of your employer, did

24  you recommend any changes to your manager or to

**ASHLEY HOFFMAN**

1   anybody else at Midland Credit Management in

2   connection with preparing the affidavits that you

3   prepare?

4          A.     No, I did not.

5                 MR. SCHWARTZ:  Objection as to

6   form.  You can go ahead and answer.

7          A.     No, I did not.

8                 MR. SOUMILAS:  What was wrong with

9   form of that question?

10                 MR. SCHWARTZ:  You are asking her

11   about a case, which case in 2011.  You better lay

12   foundation so we know exactly what you are talking

13   about.

14          Q.     Do you remember you gave me

15   testimony earlier today you were personally sued

16   three times in 2012 allegedly for signing false and

17   misleading affidavits on behalf of your employer

18   Midland Credit Management?  Do you remember that

19   testimony?

20          A.     Yes.

21          Q.     You remember two of those lawsuits

22   were in Tennessee, another was in Pennsylvania?

23          A.     I didn't recall where they were

24   from.

**ASHLEY HOFFMAN**

1          Q.      My question was after those three

2     lawsuits personally against you in 2012, whether you

3     approached your manager or anybody else at Midland

4     Credit Management and asked them maybe they should

5     look into making some changes into the affidavits

6     that you are signing for them?

7          A.      No, I did not.

8          Q.      Have you ever recommended any

9     changes to your employer concerning the affidavits

10    that you signed for them and that are filed in court

11    throughout the country?

12         A.      I've made some recommendations,

13    yes.  I couldn't tell you exactly what they were.  I

14    don't recall.

15         Q.      Do you know when you made those

16    recommendations?

17         A.      No, I don't.

18         Q.      Do you know who you made them to?

19         A.      I would have made them to my

20    manager.

21         Q.      Do you know that for sure?

22         A.      I know that if I would have made

23    recommendations, I would have made those

24    recommendations to somebody who would do something

ASHLEY HOFFMAN

```
 1    about it.
 2              Q.      Who was your manager?
 3              A.      At the time my manager was Josh
 4    Knebel.
 5              Q.      Could you spell the last name,
 6    please.
 7              A.      K-n-e-b-e-l.
 8              Q.      Was anything done about it?
 9              A.      I don't recall.  I don't even
10    recall the specific recommendations that I gave.
11              Q.      As you sit here today you don't
12    recall any specific recommendation you made to
13    Mr. Knebel or anybody else or whether anything was
14    done about it, to use your words, correct?
15              A.      Correct.
16              MR. SOUMILAS:  Let's go off the
17    record, please.
18              VIDEOGRAPHER:  We are going off the
19    record at 1:10 PM.
20              (Recess 01:10 PM to 01:13 PM.)
21              VIDEOGRAPHER:  We are back on the
22    record at 1:15 PM.
23              Q.      Ms. Hoffman, just a couple more
24    questions.  Are you familiar or aware of anyone at
```

**ASHLEY HOFFMAN**

1        Q.        You told me your regular routine

2    was you would not have communications with the

3    attorneys who made requests for these affidavits like

4    Hoffman 1, correct?

5        A.        Typically no.

6        Q.        Do you ever in your life, again

7    without telling me what was said, do you recall any

8    conversation with Mr. Weinstein?

9        A.        Yes.  I've had conversations with

10    him via e-mail.

11        Q.        Would that have been in the

12    Montgomery case or other matters?

13        A.        I don't recall specifically.

14        Q.        Turning not to attorneys but non

15    attorney people such as your manager at Midland

16    Credit Management or some other business person, has

17    anyone in the time you've been there between 2009 and

18    the present told you that you should do anything

19    different in preparing these affidavits like Hoffman

20    1, different from the process that you described

21    today and explained to us how you prepared Hoffman

22    1?

23        A.        No.  The process has been the same

24    since I started in 2009.

**ASHLEY HOFFMAN**

1    STATE OF MINNESOTA

                             CERTIFICATE

2    COUNTY OF HENNEPIN

3

4          BE IT KNOWN, that I took the deposition of

    ASHLEY HOFFMAN at the time and place set forth

5    herein;

6          That I was then and there a Notary Public in

    and for the County of Hennepin, State of Minnesota

7    and by virtue thereof I was duly authorized to

    administer an oath;

8

9          That the witness before testifying was by me

    first duly sworn to testify to the whole truth

    relative to said cause;

10

11         That the testimony of said witness was

    recorded in shorthand and transcribed into

    typewriting, and that the deposition is a true record

12   of the testimony given by the witness, to the best of

    my ability;

13

14        That I am not related to any of the parties

    hereto nor interested in the outcome of the action;

15        That the reading and signing of the

    deposition by the witness was waived;

16

17        That the original transcript was charged and

    delivered to attorney conducting the deposition for

    filing, that copies were charged at the same rate to

18   respective counsel;

19

20              WITNESS MY HAND AND SEAL THIS

               8TH DAY OF MARCH 2013.

21

22    [Notary seal: LISA M. PETERSON, Notary Public-Minnesota, My Commission Expires Jan 31, 2015]   *Lisa Peterson*

23   ------------------------------

               Lisa M. Peterson

24        My commission expires 1/31/15